# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FT. MYERS DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff**

**-vs-**                                                                                 **Case No. 2:09-cr-7-FtM-29DNF**

**HECTOR SAUL CRUZ-GUZMAN,**

        **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

    This cause came on for consideration on the following motion filed herein:

> **MOTION:**    **MOTION TO SUPPRESS (Doc. No. 21)**
>
> **FILED:**      **April 3, 2009**
>
> _____
>
> **THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

    The Defendant, Hector Saul Cruz-Guzman is requesting that the Court suppress all evidence seized from the Defendant's vehicle and all statements made by the Defendant subsequent to his traffic stop. The Government filed a Response (Doc. 23) arguing that the evidence and statements should not be suppressed. An evidentiary hearing was held on April 24, 2009. The Government filed a Supplemental Memorandum of Law (Doc. 27) on April 29, 2009, and the Defendant filed Supplemental Authority to the Motion to Suppress Evidence (Doc. 28) on April 29, 2009. The

Defendant is charged in a One Count Indictment with transporting illegal aliens into the United States for financial gain in violation of 8 U.S.C. §1324)(a)(1)(A)(ii).

**I. Testimony**

The Government presented the testimony of Senior Special Agent Kathryn Dellane-Mangone with the Department of Homeland Security, Immigration and Customs Enforcement, Sergeant John Poling from the Collier County Sheriff's Office, and Special Agent Christopher Brown of Immigration and Customs Enforcement. (Tr.[1] p. 5, 10, 85). A portion of the DVD of the incident that is Government's Exhibit 1 was played during the hearing and a portion of the transcript of the DVD which is Government's Exhibit 2 was also shown during the hearing.

The testimony at the hearing was as follows. On January 29, 2009, Sgt. Poling was on duty on Interstate 75. (Tr. p. 11). At approximately 5:30 p.m., he noticed a van with a damaged passenger-side head light. (Tr. p. 11, 17). He was in an unmarked vehicle, but did have lights and a siren, and he conducted a traffic stop of the van. (Tr. p. 11-12). His vehicle was equipped with a video recorder. (Tr. p. 12). A DVD of the traffic stop was made. (Tr. p. 12, 13). The vehicle was stopped and Sgt. Poling approached the vehicle. (Tr. p. 17). He asked the driver for his license and registration, and asked the driver to exit the vehicle. (Tr. p. 17). At the time, he was not aware of any other passengers in the vehicle. (Tr. p. 17).

The Defendant went to the glove box and removed papers. (Tr. p. 17). At some point Sgt. Poling began to write the citation for the headlight.(Tr. p. 18). Sgt. Poling requested back-up because he thought the Defendant appeared nervous and the Defendant's travel plans were nonsensical. (Tr.

---

[1] "Tr." refers to the transcript (Doc. 32) of the hearing held on April 24, 2009.

p. 18). The Defendant said that he was coming from Tampa or Orlando to Miami to look for parts for the headlight. (Tr. p. 18). The Defendant's fingerprints were taken and then run for identification on the Rapid Identification System which takes approximately five to ten minutes to complete. (Tr. p. 19-20). This new system provides a criminal history of an individual and indicates whether there are any outstanding warrants or whether the individual has fraudulent identification. (Tr. p. 19-20).

The Rapid Identification System did not function well, and the officers could not verify any information about the Defendant. (Tr. p. 21). The officers discovered that there was a passenger in the van and asked the passenger to exit the vehicle. (Tr. p. 23). Sgt. Poling used his police dog to perform a free air search of the vehicle. (Tr. p. 23). The police dog did not alert. (Tr. p. 59). Sgt. Poling issued a warning and then the decision was made that the Defendant was free to leave. (Tr. p. 21). Sgt. Poling said some words to the effect of "Have a good day or evening" and gave the Defendant his paperwork back. (Tr. p. 21). Approximately sixteen minutes had passed since the inception of the stop. (See, Gov. Ex. 2). As the Defendant was walking away, Sgt. Poling asked him if he had anything illegal in the vehicle, and asked for the Defendant's consent to search the vehicle. (Tr. p. 21-22). The Defendant agreed to the search of the vehicle, and Sgt. Poling re-verified the consent. (Tr. p. 22). The officers found a socket set, the interior lights were covered with tape, the floor was double carpeted, the seat bolts were tooled, the power buttons were taped down, and no luggage or clothing in the van. (Tr. p. 22). The search of the van took approximately 20 minutes. (See, Gov. Exh. 2).

Sgt. Poling testified that he was confused about the situation and was concerned that the Defendant was transporting something such as illegal drugs or illegal aliens. (Tr. p. 23-24). Sgt. Poling asked the Defendant if he could search his person. (Tr. p. 24). The Defendant agreed to the search

and Sgt. Poling found a paper list on the Defendant with names, phone numbers, and amounts of money. (Tr. p. 24). Sgt. Poling believed that this list indicated that the Defendant might be involved in the transportation of illegal immigrants or human trafficking or possibly something to do with illegal drugs. (Tr. p. 24). The Defendant also had a significant amount of cash on him. (Tr. p. 25). Sgt. Poling gave the Defendant his *Miranda* warnings in English and asked if the Defendant understood them, which the Defendant said he did. (Tr. p. 25). The Defendant agreed to answer questions. (Tr. p. 25). Sgt. Poling also gave the Defendant a card with the *Miranda* warnings in Spanish and had the Defendant read it. (Tr. p. 69-70). Sgt. Poling and the Defendant had a discussion about transporting people. (Tr. p. 26). The Defendant said it was his second trip transporting people in the van from Houston, Texas. (Tr. p. 26). Sgt. Poling questioned the Defendant about the transportation of illegal aliens. (Tr. p. 27).

Sgt. Poling then contacted Sgt. Dasher who provided a contact for Special Agent Brown from Immigration and Customs Enforcement. (Tr. p. 28). He advised Special Agent Brown that he had an apparent human trafficking case, and that he had a ledger, and a driver, and asked his advice if this is something that needed pursuing. (Tr. p. 28). The name of the passenger in the van was on the ledger, and the officers determined that the passenger was an illegal alien. (Tr. p. 28-29). Sgt. Poling was attempting to verify whether he should detain the Defendant and passenger. (Tr. p. 43). Special Agent Brown advised Sgt. Poling that he was responding to the case, but he had to drive from Fort Myers to Naples to respond. (Tr. p,. 29). Special Agent Brown was told by Sgt. Poling that after conducting an investigation, Sgt. Poling believed that the driver was transporting a suspected illegal alien from Texas to Florida, and had dropped other people along the way. (Tr. p. 87). Special Agent Brown advised Sgt. Poling that it appeared to be a transportation case, and he was interested in pursuing it.

(Tr. p. 87). Special Agent Brown contacted his supervisor. (Tr. p. 87-88). After speaking to his supervisor, Special Agent Brown asked Sgt. Poling to detain the subjects, and that it would take him approximately 45 minutes to arrive at the substation. (Tr. p. 88-89). After interviewing the passenger, Special Agent Brown determined that the passenger was not in this country lawfully. (Tr. p. 90). Even though an interpreter was present, Special Agent Brown communicated with the Defendant in English, and they were able to communicate quite well. (Tr. p. 91).

During the entire time of the stop, the Defendant and passenger were not handcuffed. (Tr. p. 29). They were permitted to go to the bathroom as well. (Tr. p. 29-30). The Defendant and the passenger were put in an officer's vehicle immediately prior to being transported. (Tr. p. 33). It was approximately one hour and a half after the stop that the Defendant and passenger were transported to the District 2 Substation. (Tr. p. 30). Sgt. Poling informed the Defendant and passenger that they were not under arrest but were being detained for investigation. (Tr. p. 30).

Sgt. Poling had no difficulty in communicating with the Defendant in English during the entire incident. (Tr. p. 31). Sgt. Poling testified that the Defendant appeared to understand him and understood what he was asking him. (Tr. p. 31).

**II. DVD**

The DVD presents a video and oral recording of the traffic stop. Sgt. Poling stops the vehicle and informs the driver that his headlight is not functioning. He asks the driver to exit the vehicle, to move to the police vehicle, and asks for the Defendant's driver's license and registration. The Defendant obtains the paper work from the inside of the van. Sgt. Poling asks if the van is the Defendant's van and the Defendant states that the van belongs to a friend who is from Texas but lives

in Orlando. The Defendant walks to the police vehicle. Sgt. Poling tells the Defendant that he will give him a warning and not a ticket for the broken headlight. He asks the Defendant where he is from and the Defendant states Honduras. Sgt. Poling asks the Defendant where he is going and he says Miami and will be there for a day or two. The Defendant states he is looking for a headlight, and will be staying with a friend in Miami. Sgt. Poling asks what the Defendant does for a living, and he said he works in stucco, but business is bad right now. The Defendant says that he lives in Tampa and his friend who owns the van lives in Orlando, but lets him use the van. Sgt. Poling asks the Defendant if he has called any junkyards about parts. The Defendant says he has, but he is relying on his friend. Sgt. Poling tells the Defendant he is going to use his police dog, and then the Defendant states that there is another person in the van. Sgt. Poling asks the passenger if he speaks English and he says no.

Sgt. Poling takes his police dog around the van. Another officer appears in the video. The police dog does not alert on the van. The other officer asks the Defendant for his fingers for fingerprints. Sgt. Poling has a discussion outside the hearing of the Defendant about how the Defendant lives in Tampa and not in Orlando, yet his friend who loaned him the car lives in Orlando. Sgt. Poling explains to the Defendant that the citation is a warning and tells the Defendant he will be able to leave in a minute when the license has been run. The Defendant states that when the light is gone it is more dangerous basically asserting that he would like to leave, and Sgt. Poling tells him that the officers will be done in a minute, and the Defendant responds that it is no problem, and that the officers should do their job. Sgt. Poling and the Defendant discuss that none of the salvage yards in Tampa, Orlando or Clewiston have the parts the Defendant needs to fix the headlight. The fingerprint check does not work. Sgt. Poling is suspicious that the Defendant is not able to find parts for the headlight, and has to travel to Miami to get parts for the van.

Sgt. Poling tells the Defendant that he is good to go two times and he appreciates his cooperation. As the Defendant walks away, Sgt. Poling asks if there is anything illegal in the vehicle, and the Defendant says no. Sgt. Poling asks if he can search the van, and the Defendant agrees to allow the officers to search. The officers conduct a search of the vehicle. An officer mentions that the bolts in the van are tooled. and there is no luggage. Sgt. Poling asks the Defendant about his clothes, and the Defendant states that he is not going to change his clothes. Sgt. Poling finds a socket set with one socket missing.

After approximately 36 minutes, Sgt. Poling asks the Defendant if he can search him. (See, Gov. Exh. 2). He asks the Defendant if he has any guns, knives, or drugs. Sgt. Poling asks again if he can search the Defendant. The Defendant tells Sgt. Poling that he can search him. Sgt. Poling asks if he can search his wallet and the Defendant agrees. Sgt. Poling finds a piece of paper on the Defendant, and the Defendant states that it is a list of people. Sgt. Poling finds a large amount of cash on the Defendant, and comments that it is a large amount of money for someone is who is not working.

Sgt. Poling tells the Defendant he is not under arrest. Sgt. Poling tells the Defendant that he is going to read something to him in English, and asks if the Defendant understands English. The Defendant states, "Not much I . . ." Sgt. Poling reiterates that the Defendant understands that he gave consent to search the van and his person, and the Defendant responds that he did. Sgt. Poling verifies that the Defendant can read Spanish. Sgt. Poling reads the Defendant his *Miranda* rights in English, and allows the Defendant to read them in Spanish. He asks if the Defendant read and understood his rights in Spanish and asks if the Defendant wants to talk to him. The Defendant responds, "I don't know if I can speak to you but there is no problem." Sgt. Poling tells the Defendant that he can stop speaking at any time. Sgt. Poling tells the Defendant he thinks that something illegal is going on such

as smuggling humans or drugs based upon how the van was modified. The Defendant responds that he drove from Orlando to Houston to pick up people. The Defendant claims that the people are legal. Sgt. Poling asks the passenger for his papers, and the passenger responds that he has no papers. Sgt. Poling believes that the passenger is here illegally. The Defendant states that he is legally in this country. Sgt. Poling asks the Defendant how much he got paid to make the trip. The Defendant responds that he was paid $500 to drive.

**II. Analysis**

The Defendant argues that the evidence and statements made by the Defendant must be suppressed based upon the unreasonable seizure of the Defendant and his vehicle, and the illegal search. The Defendant argues that the officers had no reasonable suspicion to detain the Defendant after the warning was issued. The Defendant asserts that the search of the vehicle with a police dog was done without probable cause or any reasonable suspicion. The Defendant also asserts that the Defendant did not affirmatively waive his right to remain silent. The Government argues that the stop was reasonable and the continuation of the encounter was consensual and therefore, not illegal. Further, the Defendant knowingly and voluntarily chose to talk to the officers.

**A. The Stop**

Sgt. Poling testified that he conducted a stop of the van due to a front headlight being broken. The Fourth Amendment provides protections to individuals from unreasonable searches and seizures by government officials, and this protection extends to investigatory stops of people or vehicles. *United States v. Johnson*, 192 Fed.Appx. 935, 938 (11th Cir. 2006), (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). A stop of an automobile by police, even if only for a brief period of time and for

a limited purpose constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810 (1996), citations omitted. A traffic stop must not be "unreasonable" under the circumstances. *Id*. at 810. A decision to stop a vehicle is reasonable when the officer has probable cause to believe a traffic violation occurred. *Id*., *See Also*, *United States v. Johnson*, 307 Fed.Appx. 372, 373-4(11th Cir. 2009). In the instant case Sgt. Poling stopped the vehicle due to his observation of a broken headlight. Pursuant to Fla.Stat. §316.610, it is a violation of Florida law to operate a vehicle in an unsafe condition which includes not being properly "equipped with such lamps and other equipment in proper condition." Further, "[a]ny police officer may at any time, upon reasonable cause to believe that a vehicle is unsafe or not equipped as required by law, or that its equipment is not in proper adjustment or repair, require the driver of the vehicle to stop and submit the vehicle to an inspection and such test with reference thereto as may be appropriate." Fla. Stat. §316.610(1). In the instant case, Sgt. Poling observed one of the headlights on the van to be broken, and therefore, the Court determines that Sgt. Poling had probable cause to stop the vehicle to inspect the headlight.

### B. Police Dog Search

The Defendant argues that Sgt. Poling had no probable cause to have a police dog conduct a free air search of the van. The use of a drug-sniffing dog on the exterior of a vehicle is not considered a search under the Forth Amendment. *United States v. Nelson*, 2009 WL 255656, *1 (11th Cir. Feb. 4, 2009). Therefore, no probable cause is required to conduct a free air search of the vehicle.

### C. Length of Stop

The Defendant asserts that he was illegally detained beyond the time that was necessary to complete the stop and issue the warning citation. The length of a traffic stop must be "'reasonably

related in scope to the circumstances which justified the interference in the first place.'" *United States v. Frazier*, 194 Fed. Appx. 694, 700 (11th Cir. 2006) (citing *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003)). A stop must be of a limited duration and cannot last "'any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity.'" *Id*. (quoting *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001)). The length of the stop is limited to the time necessary to effectuate the purpose of the stop, however, an officer does have an affirmative duty to investigate suspicious circumstances. *Id*. (citing *Purcell*, 236 F.3d at 1277) and *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991)). In addition, officers are permitted to conduct a variety of checks on the driver and his car which include questioning the driver about the traffic violation, requesting the driver to consent to a search of the car, and running a computer check on the driver for outstanding warrants. *Id*. (citing *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999) and *Purcell*, 236 F.3d at 1278)).

An officer is permitted to ask a driver if he consents to a search of the vehicle. *United States v. Gonzalez*, 275 Fed.Appx. 930, 933 (11th Cir. 2008). "When the driver voluntarily consents to a search of his vehicle, 'the remainder of the detention [is] consensual so long as the scope of the search [does] not exceed the consent given.'" *Id*. (quoting *Purcell*, 236 F.3d at 1279 n. 8). "Thus where the driver raises no issue concerning the scope or duration of the search, only the time period between the initial stop and the driver's consent is relevant to the reasonableness of the duration of the traffic stop." *Id*. (citing *Purcell*, 236 F.3d at 1279, and *United States v. Hernandez*, 418 F.3d 1206, 1209-10 (11th Cir. 2005)).

The length of the stop from the time that Sgt. Poling stopped the vehicle until the time that he told the Defendant that he was free to leave was approximately 16 minutes. During that time, the

officers were writing the citation, conducting a check on the Defendant, and conducting a free air search of the van. The Court finds that an approximate 16 minute traffic stop is not an unreasonable length of time. *See, United States v. Hernandez*, 418 F.3d 1206,1212 n. 7 (11th Cir. 2005) (When inception of traffic stop is lawful, then Eleventh Circuit doubts that a "resultant seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short"). After Sgt. Poling told the Defendant he was free to leave, and the Defendant began to walk away, Sgt. Poling asked the Defendant if he would consent to a search of the van. The Defendant gave his consent, and the officers searched the van for approximately 20 minutes. A 20 minute search of the van is not unreasonably long, further the Defendant did not raise the issue of the duration of the search while the search was being conducted. After a search of the van was completed, Sgt. Poling asked the Defendant to consent to a search of his person. The Defendant consented to the search of his person, and did not raise any issue as to the duration of this search. Therefore, the Court finds that the duration of the stop was not illegal.

### C. Consents to Search

The Defendant asserts that the officers did not explain to the Defendant that he was not required to cooperate with the police. It is well settled that under the Fourth Amendment, a search conducted without a warrant issued upon probable cause is "'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S.218, 219 (1973) (citations omitted). One established exception to the requirements of both a warrant and probable cause is that the search is conducted pursuant to consent. *Id*. (citations omitted), *United States v. Brown*, 243 Fed.Appx. 544, 548 (11th Cir. 2007). A consent to search "'must be the product of an essentially free and unconstrained choice.'" *United States v. Zapata*, 180 F.3d 1237,

1241 (11th Cir. 1999), (quoting *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989)). The Court must consider the totality of the circumstances to determine if the consent was voluntary. *U.S. v. Drayton,* 536 U.S. 194, 207 (2002)*, Schneckloth v. Bustamonte*, 412 U.S.218, 226, (1973). In considering the totality of the circumstances, the Court must examine several factors including any coercive police procedures, the defendant's cooperation with officers, the defendant's knowledge of his right to refuse to consent, the defendant's education and intelligence, and the defendant's belief that there is no incriminating evidence to be found. *United States v. Brown*, 2007 WL 2688662, *5 (11th Cir. 2007). The burden is on the Government to show that the consent was freely and voluntarily given. *United States v. Tovar-Rico*, 61 F.3d 1529, 1536 (11th Cir. 1995).

The Defendant was told he was free to leave and then he was asked if there was anything illegal in the van, and he responded negatively. Sgt. Poling then asked if he could search the van. He asked the question twice, and the Defendant responded affirmatively both times that Sgt. Poling could search the van. Sgt. Poling was not coercive in any way, nor was the situation coercive. After the van was searched, Sgt. Poling asked the Defendant is he could search him. Sgt. Poling asked twice if he could search the Defendant and the Defendant responded by lifting his arms and then by saying "Yeah, Yeah." From the inception of the stop, the Defendant cooperated with the officers answering their questions. There was no evidence that the Defendant knew he had the right to refuse his consent, however this knowledge is only one factor in determining the voluntariness of the consent and "'the government need not establish such knowledge as the sine qua non of an effective consent.'" *United States v. Holmes*, 270 Fed. Appx. 767, 768 (11th Cir. 2008) (quoting *Schneckloth*, 412 U.S. at 227)). The Defendant responded to the officers in an intelligent and appropriate manner. The Defendant was asked if there was anything illegal in the van, and was asked if he had any guns, knives, or illegal drugs

on him, and he responded negatively to these questions. The Defendant did not act as if there was any incriminating evidence to be found in the van nor on his person. Based upon all of the factors, the Government has established that the consent to search the van and the consent to search the Defendant's person were freely and voluntarily given.

**D. Waiver of Miranda**

The Defendant argues that he did not waive his *Miranda* rights. When a suspect makes statements during a custodial interrogation, the statements are not admissible unless he has been given his rights and he "knowingly, voluntarily, and intelligently waived them." *Unites States v. Jean*, 285 Fed. Appx. 651, 653 (11th Cir. 2008) (citing *Miranda v. Arizona*, 384 U.S. 436, 444-445 (1966)). The Supreme Court held that when a person is undergoing a custodial interrogation and the suspect indicates "'in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" *Coleman v. Singletary* 30 F.3d 1420, 1423 (11th Cir. 1994)(quoting *Miranda v. Arizona*, 384 U.S. 436, 473-4 1966)). The issue in the instant case is whether the Defendant's statements constituted an unequivocal invocation of his right to remain silent. Sgt. Poling said to the Defendant that he was going to read something to him in English and asked if he understood English. The Defendant responded "Not much I . . ." (Gov. Ext. 2, p. 3). Sgt. Poling asked the Defendant if he read Spanish to which he responded, "yeah." (Gov. Ext. 2, p. 3). Sgt. Poling then read the Defendant his *Miranda* rights and asked him if he understood them, and the Defendant responded "I . . " (Gov. Exh. 2, p. 3). Sgt. Poling asked, "With these rights in mind do you wish to speak with me?" and the Defendant replied, "Yes." (Gov. Exh. 2, p. 3). Sgt. Poling then allowed the Defendant to read the *Miranda* card in Spanish. He asked the Defendant if he read the rights in Spanish and if he understood them, and the Defendant responded "yeah" both times. (Gov. Exh. 2, p. 4). Sgt. Poling

then asked, "Yeah. Do you still wish to speak with me? Do you want to talk to me?" (Gov. Exh. 2, p. 4). The Defendant responded, "I don't know. . . I can speak to you but there is no problem." (Gov. Exh. 2, p. 4). Sgt. Poling asked again, "Do you wish to speak to me?" (Gov. Exh. 2, p. 4). The Defendant responded "I (unintelligible) you know." (Gov. Exh. 2, p. 4). Sgt. Poling told the Defendant, "And anytime you wanna stop you can stop." (Gov. Exh. 2, p. 4).

The Defendant asserts that he does not speak and understand English sufficiently to have understood his rights when they were read to him. A suspect effectively waives his *Mrianda* rights when he:

> (1) voluntarily relinquished them as the product of a free and deliberate choice, rather than through intimidation, coercion, or deception; and (2) made his decision with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them.

*United States v. Guerrero*, 296 Fed. Appx. 764, 766 (11th Cir. 2008) (citing *United States v. Barbour,* 70 F.3d 580, 585 (11th Cir. 1995)). A court must consider the totality of the circumstances surrounding whether a suspect has the requisite level of comprehension. *Id.* (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). In the recording of the stop, the Defendant responds appropriately in English to Sgt. Poling throughout the incident. Further, Sgt. Poling gives the Defendant the *Miranda* card in Spanish which the Defendant reads and states that he understands. The Court determines that the Defendant had the requisite level of comprehension in making his decision to talk to the officers.

The Eleventh Circuit held that "[a] suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent. If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation." *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994). The Eleventh Circuit concluded that the

statement "'I don't know. But if he said to stop it I don't want to do what he said not to do,'" is an equivocal statement. *Id*. In the instant case, the Defendant said, "I don't know . . . I can speak to you but there is no problem." This statement is an equivocal statement and the Defendant never later clearly invoked any desire to stop the questioning so that a reasonable officer would understand that he was invoking his right to remain silent. Therefore, the Court finds that the statements made by the Defendant were not in violation of his Constitutional rights.

**III. Conclusion**

The Court determines that the length of the stop was not illegal, the Defendant consented to the search of the van and his person, and the Defendant waived his *Miranda* rights. Therefore, the Court respectfully recommends that the Motion to Suppress be denied.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this  21st  day of April, 2009.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record